# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-60562

————

United States Court of Appeals
Fifth Circuit

**FILED**

September 27, 2016

Lyle W. Cayce
Clerk

MARIA CAZORLA, ET AL,

       Plaintiffs

v.

KOCH FOODS OF MISSISSIPPI, L.L.C.; JESSIE ICKOM,

       Defendants

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

       Plaintiff - Appellant Cross-Appellee

v.

KOCH FOODS OF MISSISSIPPI, L.L.C.,

       Defendant - Appellee Cross-Appellant

————

Appeals from the United States District Court
for the Southern District of Mississippi

————

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

      Hispanic employees of Koch Foods ("Koch"), a poultry processor, allege harassment and abuse on the job. Koch claims they made up the allegations in order to get U visas, which are available to abuse victims who assist in government investigations. The company sought discovery of any information

No. 15-60562

related to the employees' U visa applications. Plaintiffs objected, pointing out that the discovery would reveal to Koch the immigration status of any applicants and their families. The district court allowed the discovery in part, and both sides appealed. We VACATE the district court's certified discovery orders and REMAND.

## I

Koch Foods ("Koch") operates a large poultry processing plant in Morton, Mississippi. This suit arises from events that allegedly took place in the plant's debone department, where some eighty-five employees debone and package chicken thighs. The workers in this department, some of whom Koch apparently still employs, were overwhelmingly Hispanic. Most were illiterate and spoke little or no English, and many were undocumented aliens.[1] Between 2004 and 2008, they allegedly suffered routine abuse at work. Koch supervisors allegedly groped female workers, and in some cases assaulted them more violently;[2] offered female workers money or promotions for sex; made sexist and racist comments; punched, elbowed, and otherwise physically abused workers of both sexes; and demanded money from them in exchange for permission for bathroom breaks, sick leave, and transfers to other positions. Jessie Ickom ("Ickom"), a debone department supervisor, was allegedly responsible for much of the abuse, but other supervisors also allegedly participated. When workers complained or resisted, Koch managers allegedly ignored them, and some debone supervisors allegedly retaliated by docking their pay; demoting, reassigning, or firing them; and threatening to physically harm them or have them arrested or deported.

---

[1] Plaintiffs seem to have implicitly conceded that many of the individual claimants are undocumented.

[2] One female employee testified that a supervisor, Jessie Ickom, penetrated her vagina with his hand. Another testified that Ickom forced her against a wall and ran his hands under her shirt.

No. 15-60562

Koch calls these allegations "baffling," "outrageous and extraordinary," and "fantastic," and claims that the "record show[s] that [they] were made to obtain immigration benefits under the U-visa program." Since 2000, this program has offered temporary nonimmigrant status to victims of "substantial physical or mental abuse" resulting from certain offenses, including sexual assault, abusive sexual contact, extortion, and felonious assault.[3] For a victim to receive a U visa, a law enforcement agency such as the Equal Employment Opportunity Commission (EEOC) must certify that he or she is aiding an investigation into the alleged offenses, and the U.S. Customs and Immigration Service (USCIS) must conduct its own *de novo* review of relevant evidence and confirm the victim's eligibility.[4] U visas generally entitle their holders and their family members to four years of nonimmigrant status; holders may also apply for lawful permanent residence (a "green card") after three years.[5] Finally, aliens with "pending, bona fide" U visa applications may obtain work authorization.[6]

Koch claims that the claimants made up their accusations in hopes of securing U visas, and that the EEOC solicited and certified their false claims in order to build a high-profile, class-based discrimination suit against the company. This appeal concerns Koch's attempt to obtain concrete evidence of this malfeasance – namely, any and all records relating to the claimants' speculated U visa applications – through discovery.[7]

---

[3] 8 U.S.C. § 1101(a)(15)(U)(i), (iii); *see* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533-35.

[4] *See* 8 U.S.C. § 1101(a)(15)(U)(i); *id.* § 1184(p)(1), (4); 8 C.F.R. § 214.14(c)(2), (4)-(5).

[5] 8 U.S.C. §§ 1184(p)(6), 1255(m)(1)(A).

[6] 8 U.S.C. § 1184(p)(6).

[7] Koch also sought to discover any records related to other immigration benefits, including T visas (available to human trafficking victims), Violence Against Women Act benefits, and Temporary Protected Status benefits. On appeal, however, both parties focus on U visas.

No. 15-60562

Litigation over the alleged wrongdoing at the Morton plant began in 2009, when ten workers filed Title VII discrimination charges with the EEOC alleging abuse by Ickom. In 2010 and 2011, several of the same workers sued Koch and Ickom in federal district court, alleging that Ickom's abuse and Koch's failure to remedy it violated federal and Mississippi law. The suit was stayed pending the resolution of their EEOC charges.

The EEOC investigated the workers' discrimination charges, found reasonable cause to believe that Title VII violations had occurred, and attempted conciliation with Koch. The conciliation process failed, and in June 2011, the EEOC filed its own suit against the company, alleging discrimination against the individuals that had filed charges as well as "an estimated class of 50 to 75 other Hispanic men and women" who had worked at the Morton plant. The district court consolidated the EEOC's suit with that of the individual employees. Several employees then intervened in the EEOC's suit.

In August 2012, Koch served the agency and the individual plaintiffs with discovery requests. All plaintiffs moved for a Rule 26 protective order insofar as Koch sought information relating to the individual employees' and class members' (collectively, the "individual claimants" or "claimants") immigration status and history. In response, Koch did not argue that the claimants might be lying in order to obtain U visas, instead citing other reasons why immigration status might be relevant to the case. A magistrate judge rejected Koch's arguments and granted the order in relevant part, opining that "[a]ny relevance of immigration status is clearly outweighed by the *in terror[e]m* effect disclosure of this information would have in discouraging the individual plaintiffs and claimants from asserting their rights in this lawsuit."

In April 2013, after several months of discovery, Koch served a second set of discovery requests specifically demanding information and records relating to claimants' efforts to obtain U visas. That discovery inevitably would

4

No. 15-60562

have revealed the immigration status of any claimants who applied for U visas, as well as that of their families. The plaintiffs refused Koch's demands on several grounds, including the magistrate judge's protective order. The individual plaintiffs also rejected Koch's demand that they execute waivers allowing the Department of Homeland Security to share information about them with Koch, claiming that 8 U.S.C. § 1367 protected such information from disclosure.

Koch moved to compel production and for reconsideration of the existing protective order. The magistrate judge granted the motion in relevant part, allowing discovery of U visa-related information:

> [Koch] now focuses on one particular area not raised earlier: discovery concerning the individual plaintiffs' and claimants' attempts to obtain U visas [and] other immigration benefits that may be available to them because of the allegations they have made. It is Koch Foods's contention that some of the allegations . . . are false and were made solely for the purpose of obtaining such benefits. . . . Koch Foods has raised a legitimate defense . . . . The relevance of this information clearly outweighs its *in terror[e]m* effect, as any individuals who have applied for immigration benefits have, necessarily, already disclosed their immigration status to federal authorities.

Plaintiffs moved for review of the magistrate judge's order.[8] After examining some of the information Koch sought in camera, the district court upheld the order in part and modified it in part. The court found that 8 U.S.C. § 1367 and its implementing regulation barred the EEOC from revealing any information related to the claimants' U visa applications. Accordingly, it excused the agency from complying with Koch's demand. However, the court found that § 1367 did not similarly excuse the claimants themselves. The court

---

[8] *See* FED. R. CIV. P. 72(a) (allowing such review, and requiring the district court to "modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or is contrary to law").

No. 15-60562

then determined that Rule 26 did not otherwise preclude U visa discovery from the individual claimants, reasoning that the discovery was relevant to the claimants' credibility, that it might explain an "exponential jump in claims after the EEOC became involved,"[9] and that the relevance of the information sought outweighed the *in terrorem* effect of producing it.[10] In a subsequent order, the court clarified that Koch Foods could obtain U visa information from *all* claimants: that is, from both the workers who had separately sued Koch, and the workers whom the EEOC claimed had been harassed, but who had not joined the separate lawsuit. Nevertheless, the court emphasized that not all information about claimants' immigration history was discoverable: discovery was to be "limited to information regarding efforts to obtain U Visas, or other immigration benefits, that arose out of the allegations in this civil action against Koch Foods."

At the district court's direction, the magistrate judge entered a protective order to govern U visa discovery. That order prohibited use of the discovered information for business purposes unrelated to the lawsuit "unless . . . required by relevant law," and barred Koch from sharing the information with law enforcement "unless a failure to do so would constitute a violation of criminal law." The magistrate judge disregarded plaintiffs' suggestions to require the use of anonymous identifiers and to allow disclosure only to Koch's attorneys and not to the company itself.

The EEOC then sought interlocutory review of the district court's discovery orders under 28 U.S.C. § 1292(b). The district court certified the

---

[9] Specifically, the court noted that "[t]his matter started with just eight complaining parties, but two-and-a-half years after the litigation began, the EEOC filed its Second Amended Complaint in which the number jumped to 117."

[10] S*ee* Fed. R. Civ. P. 26(b), (d).

No. 15-60562

orders for interlocutory appeal and stayed proceedings in the meantime. We granted the parties' ensuing petition and cross-petition for review.

## II

We review the district court's statutory interpretation *de novo*[11] and its Rule 26 balancing analysis for abuse of discretion.[12] A court engaging in a balancing analysis abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."[13]

## III

We first confirm our jurisdiction. Koch raises two jurisdictional objections to plaintiffs' appeals. Each fails.

First, Koch asks us to exercise our discretion not to review the district court's Rule 26 balance on interlocutory review. We decline Koch's late invitation. To be sure, outside the context of § 1292(b), Rule 26 balancing disputes do not normally merit interlocutory review.[14] Nonetheless, by fully

---

[11] *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

[12] *Moore v. CITGO Ref. & Chems. Co., L.P.*, 735 F.3d 309, 315 (5th Cir. 2013).

[13] *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984), *cited with approval by In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc); *see generally United States v. Taylor*, 487 U.S. 326, 336 (1988) ("Whether discretion has been abused depends, of course, on the bounds of that discretion and the principles that guide its exercise. [If] Congress merely commit[s] the choice of remedy to the discretion of district courts, without specifying factors to be considered, a district court would be expected to consider 'all relevant public and private interest factors,' and to balance those factors reasonably." (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981))).

[14] *See Honig v. E. I. duPont de Nemours & Co.*, 404 F.2d 410, 410 (5th Cir. 1968). *But cf. Hyde Const. Co. v. Koehring Co.*, 455 F.2d 337, 338-39, 342-44 (5th Cir. 1972) (accepting interlocutory appeal of a complex attorney-client privilege dispute "at the heart of a pending controversy," and, after resolving the relevant legal issue, completing an "an independent examination of the 81 documents in question" and determining which ones were and were not privileged).

No. 15-60562

addressing this one, we may be able to hasten the end of this already long-running litigation, e.g., by preventing post-trial appeals on the same topic and clarifying the permissible scope of U visa discovery, preventing further pretrial disputes.[15] We therefore see fit to review the district court's discovery order in its entirety.[16]

Second, Koch argues that "Individual Plaintiffs' intervention is not proper because they failed to timely file a petition for permission to appeal." We granted the EEOC's petition for interlocutory review on August 12, 2015. The individual plaintiffs petitioned to intervene in the EEOC's appeal twelve days later. In their petition, they acknowledged that no rule or precedent set forth deadlines for intervention in an interlocutory appeal, and suggested that we apply a deadline of fourteen days from the initial petition for interlocutory review (i.e., the one to be joined), following Rule 4(a)'s timeline for intervention in an appeal as of right.[17] A motions panel of this court allowed intervention in a summary order, thus implicitly accepting the individual plaintiffs' proposal.[18]

---

[15] *See, e.g.*, *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 380 & n.2 (5th Cir. 2004) (addressing an element of the appeal other than the "controlling question of law" at issue when doing so would "most expeditiously resolve th[e] litigation"). At least one other appellate court has exercised its discretion under § 1292 to review a district court's Rule 26 balancing analysis. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063, 1074-75 (9th Cir. 2004).

[16] The district court certified its order for interlocutory review because it found that its interpretation of 8 U.S.C. § 1367 was a "controlling question of law." But as it correctly noted, an "appellate court may address any issue fairly included within [a] certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.'" *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (quoting 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 110.25[1] (2d ed. 1995)); *see also Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398-99 (5th Cir. 2010) (en banc) (collecting cases); *Linton v. Shell Oil Co.*, 563 F.3d 556, 557 (5th Cir. 2009) (per curiam) ("[S]ection 1292(b) authorizes certification of orders for interlocutory appeal, not certification of questions.").

[17] *See* FED. R. APP. P. 4(a)(3) ("If one party timely files a notice of appeal [as of right], any other party may file a notice of appeal within 14 days after the date when the first notice was filed.").

[18] *But see In re Piperi*, 108 F.3d 333, 1997 WL 73798, at *1 n.2 (5th Cir. 1997) (unpublished table decision) ("[A] motions panel's refusal to dismiss an appeal does not preclude the merits panel from reconsidering the existence of appellate jurisdiction."

No. 15-60562

Koch appears to argue that a deadline of ten days from the district court's certification order should apply, following 28 U.S.C. § 1292(b). But § 1292(b)'s ten-day deadline applies only to an initial application for interlocutory appeal, not a subsequent motion to intervene in such an appeal. Rule 4(a)'s deadlines are more apposite to plaintiffs' petition to intervene: Rule 5 states that a petition for discretionary review, e.g., § 1292 interlocutory review,[19] "must be filed within the time specified by the statute or rule authorizing the appeal or, if no such time is specified, within the time provided by Rule 4(a) for filing a notice of appeal," and § 1292 specifies no deadline for the individual plaintiffs' petition.[20] We find that the individual plaintiffs timely intervened.

## IV

We turn to the appropriate legal standard and procedure for this discovery dispute. In allowing discovery from the individual claimants, the district court applied Rule 26(c)(1), which allows restrictions on discovery "for good cause . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The court acknowledged plaintiffs' burden to "show good cause, 'which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements,'" in order to prevent discovery. It found that they had not carried their burden, rejecting their arguments that 8 U.S.C. § 1367's confidentiality

---

(summarizing *United States v. Bear Marine Servs.*, 696 F.2d 1117, 1119-20 & n.6 (5th Cir. 1983))).

[19] *See Castellanos-Contreras*, 622 F.3d at 399 ("Interlocutory review under § 1292(b) is not mandatory; rather, it is discretionary.").

[20] *See* FED. R. APP. P. 5(a)(2). To hold otherwise – that is, to apply the same deadline to the initial application for interlocutory appeal and a subsequent effort to intervene – would be to treat interlocutory appeals differently from appeals as of right: the Rules impose different deadlines for one party's initial notice of appeal as of right and another party's subsequent attempt to join that appeal. *See* FED. R. APP. P. 4(a)(1), (3). We see no reason why interlocutory appeals should be treated differently in this regard.

9

No. 15-60562

provisions protected the individual claimants and that U visa discovery's *in terrorem* effect would outweigh its relevance.

Plaintiffs dispute these conclusions, as discussed in the following sections. More generally, however, they also claim that the district court erred at the outset by allocating them the burden of showing good cause. As they put it, the district court should not have applied "standard Rule 26(c) procedure." Instead, they "urge this Court to hold that U-visa information is . . . presumptively sensitive information, and the party seeking this information always bears the burden of proving a particularized need for it."[21] They analogize U visa information to data that we and other courts have subjected to similar standards, including tax returns, depositions of senior officials and opposing counsel, nonparty personnel files, and presentence investigation reports.[22]

Plaintiffs' argument, however compelling, is waived. They do not appear to have presented anything like it to the district court, and the district court did not appear to detect it in what they did offer.[23] Burden-shifting, presumptions of sensitivity, references to tax-return cases, and the like are wholly absent both from the district court's opinion and from plaintiffs' motions opposing U visa discovery. In their appeal briefing, plaintiffs reference several

---

[21] Somewhat relatedly, they also argue that Koch had to plead fraud with particularity and that its failure to do so precludes U visa discovery here. But Koch is merely disputing claimants' credibility, not arguing that they are defrauding the company. If Rule 9(b) applies here, it should presumably also apply in every case in which the defendant disputes the plaintiff's claims. We decline to reach such an absurd result.

[22] *See, e.g.*, *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) (personal tax returns); *United States v. Huckaby*, 43 F.3d 135, 138 (5th Cir. 1995) (presentence investigation reports); *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986) (depositions of opposing counsel).

[23] *See AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009) ("Under this Circuit's general rule, arguments not raised before the district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'"). Plaintiffs do not argue that extraordinary circumstances are present here.

No. 15-60562

points in the record where they purportedly pressed their argument, but each shows, at most, that plaintiffs occasionally used the term "need" and advocated a balancing approach in contesting whether Koch was entitled to the discovery it sought. This did not suffice to preserve the more elaborate theory they advance on appeal.

V

Finally, we turn to the merits of the parties' appeals. We begin with their dispute over 8 U.S.C. § 1367. That statute states, in relevant part:

> Except as provided in subsection (b) of this section, in no case may the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official or employee of the Department of Homeland Security or Department of State (including any bureau or agency of either of such Departments)—
>
> [. . .]
>
> (2) permit use by or disclosure to anyone . . . of any information which relates to an alien who is the beneficiary of an application for relief under paragraph (15)(T), (15)(U), or (51) of section 101(a) of the Immigration and Nationality Act . . . .

U visa applications arise from paragraph (15)(U) of section 101(a) of the Immigration and Nationality Act and therefore fall within the scope of § 1367(a)(2).[24] In addition, 8 C.F.R. § 214.14, which implements the U visa program, provides that "[a]gencies receiving information under this section . . . are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. 1367." The EEOC asserts, and Koch does not dispute, that it is an "agency receiving information under" § 214.14.

_____

[24] *See* Immigration and Nationality Act § 101(a)(15)(U), 8 U.S.C. § 1101(a)(15)(U); *see also* 8 C.F.R. § 214.14(e)(1) ("The use or disclosure . . . of any information relating to the beneficiary of a pending or approved petition for U nonimmigrant status is prohibited.").

11

No. 15-60562

As noted above, the district court found that 8 U.S.C. § 1367 and 8 C.F.R. § 214.14 collectively precluded discovery of U visa records from the EEOC, but that discovery from the individual claimants and plaintiffs could proceed. We address each ruling, but turn first to the issue of waiver.

### 1. *Koch's waiver argument*

Koch argues that plaintiffs waived their § 1367 claims by not expressly alleging in their discovery responses that they fell within the statute's protection. We are not persuaded. First, some of plaintiffs' discovery responses *did* explicitly cite § 1367.[25] Second, Rule 26(b)(5), on which Koch relies, states only that "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged . . . the party must expressly make the claim." Plaintiffs did so: they claimed that the information Koch sought was exempt from discovery under the magistrate judge's original protective order, which was then in effect, and various other privileges.[26] We reject Koch's waiver claim.

### 2. *Section 1367's application to the EEOC*

The district court found that § 1367's text, coupled with that of 8 C.F.R. § 214.14, was unambiguous: because the EEOC is an "agenc[y] receiving information" under the U visa program, it is "bound" by § 1367's confidentiality provisions, and in turn, it may not "permit use by or disclosure to anyone . . .

---

[25] Specifically, in addressing Koch's request that they sign privacy waivers authorizing the Department of Homeland Security to release their U visa files (if any), the individual plaintiffs "object[ed] . . . to the extent [the request] [sought] personal and private information that is expressly protected by federal law, *see* 8 U.S.C. § 1367(a)(2)."

[26] If Koch is arguing that plaintiffs' references to the protective order were insufficient because they did not use the word "privilege," we find its argument unconvincing. *See Privilege*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("privilege" can simply refer to "the right to prevent disclosure of certain information in court"); *cf. infra* note 29 (citing cases holding that a statute need not use the word "privilege" to create an evidentiary privilege).

No. 15-60562

of any information which relates to" a U visa applicant. To comply with Koch's discovery requests would necessarily violate this command.

Koch disputes this straightforward reading on several grounds.[27] First, Koch argues that § 1367 does not explicitly mention discovery or state that it creates an evidentiary privilege. That is so, and as Koch correctly notes, the Supreme Court and others have observed that Congress is usually explicit when it creates an evidentiary privilege.[28] But as a purely textual matter, it is unclear why a provision broadly barring *any* "disclosure" would have to specify "including in discovery" in order to have effect. In *Baldrige v. Shapiro*, the Supreme Court held that a statute barring disclosure of census records without explicitly mentioning evidentiary privilege nonetheless prevented civil discovery of the records.[29] Koch claims that an earlier decision of the Court, *St.*

---

[27] In addition to the reasons discussed below, Koch appears to argue in its reply brief that 8 C.F.R. § 214.14 is invalid insofar as it purports to create a privilege or to extend § 1367's confidentiality provisions to the EEOC. That argument is waived. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal."). Koch's initial brief also included a somewhat confusing citation to an unrelated statute. Koch significantly expands on its citation in a footnote in its reply brief, explaining that it was actually *analogizing* the cited provision to § 1367, and that the provision evinces Congress's intent to allow U visa disclosure pursuant to court order notwithstanding § 1367. This argument is also waived. *See id.*; *de la O v. Hous. Auth. of City of El Paso, Tex.*, 417 F.3d 495, 501 (5th Cir. 2005) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). It is also dubious: if anything, the fact that Congress explicitly permitted disclosure pursuant to court order in other confidentiality provisions of VAWA suggests an intent *not* to allow such disclosure in § 1367, which has no such text.

The EEOC contends that Koch waived *its* argument on this issue by failing to specifically state in its opening brief that the district court's ruling forbidding discovery from the EEOC violated Koch's substantial rights. *See Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (we will vacate a district court's decision to limit discovery only "if it affected the substantial rights of the appellant"). Because we find that Koch's § 1367 argument fails on the merits, we need not consider this claim.

[28] *See St. Regis Paper Co. v. United States*, 368 U.S. 208, 218 (1961) ("[W]hen Congress has intended [data] not to be subject to compulsory process it has said so."); *Jicarilla Apache Nation v. United States*, 60 Fed. Cl. 611, 613 & n.1 (Fed. Cl. 2004) (collecting statutes).

[29] 455 U.S. 345, 354-61 (1982) ("[Section] 8(b) and § 9(a) of the Census Act embody explicit congressional intent to preclude all disclosure of raw census data reported by or on behalf of individuals. This strong policy of nondisclosure indicates that Congress intended

No. 15-60562

*Regis Paper Co v. United States*, supports its reading, but that case is distinguishable. In *St. Regis*, the Court held that a provision barring government officials from disclosing certain Census Bureau reports did not excuse *a private company* from disclosing the same reports in discovery.[30] Here, Koch seeks disclosure from the same officials subject to § 1367's confidentiality requirements.[31]

We find the D.C. Circuit's decision in *In re England* to be persuasive. In *England*, the D.C. Circuit construed a provision barring "disclos[ure]" of certain military promotion records "to any person not a member of the [promotion] board" to forbid civil discovery of the records.[32] Then-Judge Roberts's opinion for the court deemed this text unambiguous, but noted for good measure that discovery would inhibit Congress's purpose in enacting the provision – to encourage "frank and open discussion" of inherently sensitive information.[33] Section 1367's similar text and analogous purpose counsel the same result here as in *England*.

*3. Section 1367's application to the individual claimants*

Section 1367 and its implementing regulation clearly preclude discovery from the EEOC, but they just as clearly do *not* preclude discovery from the individual claimants. As the district court noted, the statute applies only to

---

the confidentiality provisions to constitute a 'privilege' within the meaning of the Federal Rules."); *see also In re England,* 375 F.3d 1169, 1179 (D.C. Cir. 2004) (Roberts, J.) (dismissing a proposition essentially identical to Koch's). *See generally PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998))).

   [30] 368 U.S. at 217-20.
   [31] *St. Regis* is highly relevant to the individual claimants' assertions of privilege, however. *See infra* note 38 and accompanying text.
   [32] 375 F.3d 1169, 1177 (D.C. Cir. 2004) (Roberts, J.) (interpreting 10 U.S.C. § 618(f), *repealed*, Pub. L. 109-364, § 547(a)(2), 120 Stat. 2216).
   [33] *Id.* at 1177-78.

14

No. 15-60562

certain enumerated government officials, and says nothing about whether other individuals may disclose U visa information.[34] It must therefore be read not to preclude such disclosure.[35]

Plaintiffs' arguments to the contrary are unpersuasive. They primarily argue that interpreting § 1367 not to bar discovery from the individual claimants would frustrate the statute's goal of fostering reporting of abuse. But because § 1367's text is unambiguous, any exploration of purpose is beside the point.[36] This follows from basic principles of statutory interpretation[37] and from the Court's decision in *St. Regis*. On similar facts, the *St. Regis* Court rejected an essentially identical argument:

> [T]he prohibitions against disclosure [in the Census Act] . . . run only against the officials receiving [certain reports] and do not purport to generally clothe census information with secrecy. The Solicitor General admits that 'literally construed' the restrictions of the statute go no further. But he insists that since the purpose of the statute is to encourage the free and full submission of statistical data to the Bureau, this can be accomplished only through the creation of a confidential relationship which will extend the privilege to the petitioner [a private company] and like

---

[34] The same is true of 8 C.F.R. § 214.14's confidentiality provision. *See id.* § 214.14(e).

[35] S*ee Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

[36] In any event, the scant evidence of Congress's intent in enacting and amending § 1367 (as distinguished from its broader intent in enacting the U visa program as a whole) does not clearly support plaintiffs' purpose-based argument. *See* 151 CONG. REC. E2605-04 (Dec. 17, 2005) (statement of Rep. Conyers), 2005 WL 3453763 (in discussing enhancements to 8 U.S.C. § 1367's confidentiality protections, omitting specific mention of civil discovery while explicitly stating that the provision prevents "abusers using *DHS* to obtain information about their victims, including the existence of a VAWA immigration petition" (emphasis added), but also stating more generally that the provision prevents abusers from "interfering with or undermining their victims' immigration cases").

[37] *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)); *see also Pierce County., Wash. v. Guillen*, 537 U.S. 129, 144 (2003) ("We have often recognized that statutes establishing evidentiary privileges must be construed narrowly because privileges impede the search for the truth.").

No. 15-60562

reporting companies. . . . We fully realize the importance to the public of the submission of free and full reports to the Census Bureau, but we cannot rewrite the Census Act. It does not . . . grant copies of the report not in the hands of the Census Bureau an immunity from legal process. Ours is the duty to avoid a construction that would suppress otherwise competent evidence unless the statute, strictly construed, requires such a result. That this statute does not do. Congress did not prohibit the use of the reports per se but merely restricted their use while in the hands of those persons receiving them, i.e., the government officials.[38]

*St. Regis* squarely supports the district court's reading of § 1367. The subsequent *Baldridge* case offers plaintiffs no support because the only issue before the Court in *Baldrige* was whether the Census Bureau itself could claim privilege.[39]

In addition to that analysis, plaintiffs offer two textual arguments. First, they claim that the district court's reading of § 1367 not to preclude discovery from individuals renders the provision meaningless, since it allows litigants like Koch to obtain from individuals the same information they might have sought from the officials and agencies within the statute's scope.[40] This is a variant of the purpose argument: both insist that discovery from individuals undermines the statutory confidentiality of U visa applications. And indeed, Koch appears able to get most, if not all, of the information it wants from the individual claimants.

Plaintiffs' argument has weight, and as we discuss below, the harm Koch's desired discovery might cause to Congress's purposes is highly relevant to our Rule 26 analysis. But from a purely interpretive standpoint, plaintiffs'

---

[38] *St. Regis*, 368 U.S. at 217-18.

[39] *Baldrige v. Shapiro*, 455 U.S. 345, 349-51 (1982).

[40] *See generally Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal principle of statutory construction that it is our duty to give effect, if possible, to every clause and word of a statute." (internal alterations, quotation marks, and ellipses omitted) (quoting *United States v. Menasche*, 348 U.S. 528, 538 (1955))).

No. 15-60562

argument is questionable: § 1367's confidentiality protections are not meaningless without similar protections for individuals. In turn, there is no need to depart from the straightforward text of the statute (i.e., by implying an additional privilege not explicitly set forth) in order to save it from superfluity.[41] There are many situations in which § 1367, as we read it, could provide a layer of confidentiality that cannot be circumvented by subpoenaing individuals. Most obviously, discovery assumes a lawsuit; without one, an individual presumably has the right not to disclose U visa information, and § 1367 cuts off additional potential sources of the information in barring federal officials from doing so. Even within litigation, it might be more burdensome for an individual to disclose the records than for an agency to do so, potentially enabling the individual to avoid discovery pursuant to Rule 26(b)(1) where an agency could not.[42] And U visa-related information might be protected by other privileges, e.g., attorney-client, in the hands of an individual but not in those of a federal official.

In any event, *St. Regis* forecloses plaintiffs' meaninglessness argument. The party seeking discovery in that case attempted essentially the same "end run" as Koch: it sought discovery of certain information from an individual litigant, circumventing a statute preventing federal officials in possession of the same information from disclosing it. But the *St. Regis* Court allowed this maneuver. In so doing, it implicitly but necessarily held that the "end run" did

---

[41] *Cf. Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 21-22 (2006) (declining to apply the canon against superfluity where phrases alleged to have been rendered superfluous "[did] a small amount of additional work").

[42] *See* FED. R. CIV. P. 26(b)(1) (the scope of discovery depends in part on "whether the burden or expense of the proposed discovery outweighs its likely benefit").

No. 15-60562

not render the relevant confidentiality statute meaningless.[43] We see no principled way to avoid applying its logic in this highly analogous case.

Second, plaintiffs argue that because another subsection of the statute, § 1367(b)(4), allows U visa applicants to free federal officials from the statute's constraints by consenting to disclosure, individual applicants must also have the power to refuse a subpoena seeking that information directly from them, otherwise (b)(4) is meaningless.[44] Again, we disagree. The right to regulate a third party's disclosure of one's information is logically distinct from the right not to personally disclose that information; conceptually, it is possible, if perhaps unusual, that someone might have one but not the other.[45] Thus, the district court's reading does not render § 1367's consent provision superfluous.

## 4. *Summary*

The district court correctly interpreted 8 U.S.C. § 1367. The statute bars discovery of U visa records from the EEOC, but it does not bar discovery of the records from the individual claimants. Their protection, if any, lies in the basic constraints of the discovery process – constraints we now consider.

## VI

Having determined that § 1367 did not preclude U visa discovery from the individual claimants, the district court proceeded to analyze whether there was nonetheless reason to forbid such discovery under Rule 26(c). Rule 26(c) allows the court, "for good cause, [to] issue an order" restricting discovery "to protect a party or person from annoyance, embarrassment, oppression, or

---

[43] The canon against superfluity was just as well established at the time of *St. Regis* as it is now. *See, e.g.*, *Menasche*, 348 U.S. at 538-39; *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879).

[44] *See* 8 U.S.C. § 1367(b)(4).

[45] The reasons for this arrangement would presumably be similar to those for allowing the agency, but not the individual, to refuse discovery in the first place. *See supra* notes 41-42 and accompanying text.

18

undue burden or expense." "[T]he federal courts have superimposed a somewhat demanding balancing of interests approach to the Rule. Under the balancing standard, the district judge must compare the hardship to the party against whom discovery is sought against the probative value of the information to the other party."[46] Courts also weigh relevant public interests in this analysis.[47]

The district court ruled that Rule 26 allowed discovery of U visa information from the individual claimants. The court's balancing analysis turned on three basic determinations.[48] First, although there were prior cases to support both allowing and denying the discovery under Rule 26, none of them were binding and most seemed distinguishable. Second, the discovery Koch sought had significant probative value. Third, the discovery's relevance outweighed any possible harm from allowing it.[49] We address each determination in turn.

---

[46] 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 26.101[1][c] (3d ed. 2011); *see, e.g.*, *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001).

[47] *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 209 & n.26 (5th Cir. 1999) (suggesting that "a request to depose opposing counsel generally would provide a district court with good cause to issue a protective order," and citing in support another court's observations that such depositions "disrupt[] the adversarial system, lower[] the standards of the profession, add[] to the already burdensome time and costs of litigation, and detract[] from the quality of client representation" (quoting *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986))); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1065 (9th Cir. 2004); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-89 (3d Cir. 1994); 6 MOORE ET AL., *supra* note 46, at ¶ 26.101[1][c].

[48] As discussed above, plaintiffs' argument that the district court should not have applied the usual Rule 26 balancing analysis is waived.

[49] The court did limit discovery to "information regarding efforts to obtain U Visas, or other immigration benefits, that arose out of the allegations in this civil action against Koch Foods" and specifically excused the claimants from revealing prior crimes.

No. 15-60562

*1. Relevant case law*

The district court's analysis of precedent was accurate: this dispute presents an issue of first impression in our circuit, much of the precedent the parties deem relevant is not, and what remains is equivocal.

Although courts have often barred discovery of immigration-related information, in many of these cases, immigration benefits were not alleged to have motivated or shaped the claims at issue and did not otherwise affect the plaintiffs' right to relief.[50] In such cases, courts have frequently rejected the

---

[50] Many of the parties' cases are distinguishable on this basis, including *In re Reyes*, 814 F.2d 168, 169-71 (5th Cir. 1987) (barring discovery of petitioners' immigration status because their entitlement to relief under the Fair Labor Standards Act did not depend on that status, which apparently was not at issue in any other way in the appeal); *Rivera*, 364 F.3d at 1069-72, 1074-75 (barring discovery of employment discrimination complainants' immigration status where that status was legally irrelevant to the issue of liability, its relevance to the issue of remedies was conjectural, and remedies, if any, could be addressed in a separate proceeding); *E.E.O.C. v. DiMare Ruskin, Inc.*, No. 2:11-CV-158-FTM-99, 2012 WL 12067868, at *4-5 (M.D. Fla. Feb. 15, 2012) (similar to *Reyes*); *Demaj v. Sakaj*, No. 3:09 CV 255 JGM, 2012 WL 476168, at *3-6 (D. Conn. Feb. 14, 2012) (in Hague Convention child abduction case, disallowing discovery of mother's U visa application; reasoning that production was not necessary to resolve the legal issue to which the application was purportedly relevant, and was not justified in order to allow the father to check the mother's account of abuse for consistency); *Castillo v. Hernandez*, No. EP-10-CV-247-KC, 2011 WL 1528762, at *8 (W.D. Tex. Apr. 20, 2011) (similar to *Reyes*); *EEOC v. Willamette Tree Wholesale, Inc.*, No. CV 09-690-PK, 2010 U.S. Dist LEXIS 97380, at *13 (D. Or. July 8, 2010) (refusing defendant employer's request for production of immigration documents in order to enable an exploration of plaintiffs' employment history, where such history "had no bearing" on plaintiffs' claims and, insofar as employers' defenses were concerned, would at best duplicate facts already in the record); *Avila-Blum v. Casa de Cambio Delgado, Inc.*, 236 F.R.D. 190, 192 (S.D.N.Y. 2006) (similar to *Rivera*); *E.E.O.C. v. Rest. Co.*, 448 F. Supp. 2d 1085, 1087 (D. Minn. 2006) (barring discovery of Title VII complainant's immigration status where that status was legally irrelevant to the defendant's asserted defense, and might otherwise be relevant only at a distant stage of the litigation, if then); *Topo v. Dhir*, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) (barring discovery of plaintiffs' immigration status where that status was "a collateral issue not relevant to any material aspect of the case"); *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F. Supp. 2d 191, 192 (S.D.N.Y. 2002) (similar to *Reyes*); *De La Rosa v. N. Harvest Furniture*, 210 F.R.D. 237, 239 (C.D. Ill. 2002) (similar to *Reyes*);  and several of the cases cited *infra* note 51.

No. 15-60562

notion that immigration status is itself important enough evidence of plaintiffs' broader credibility to be discoverable.[51]

But where immigration status and benefits have related more directly to the parties' claims, defenses, and credibility, as here, district courts have reached divergent results. Some have disallowed it. Most analogous to this case, in *David v. Signal International*, the defendant employer, accused of human trafficking, stressed "the self-evident, overwhelming temptation to fabricate or to exaggerate evidence to gain entry to this country for oneself and one's wife and children" in seeking discovery of plaintiffs' T and U visa applications.[52] The Eastern District of Louisiana forbade the discovery, reasoning that "any inquiry into plaintiffs' current immigration[] status . . . will most assuredly strike paralyzing fear in the plaintiffs sufficient to chill any inclination they may have had to prosecute their pending claims," thus "impos[ing] an undue burden on private enforcement of employment discrimination laws," and that "defendants' opportunity to test the credibility of plaintiffs does not outweigh the public interest in allowing employees to enforce their rights."[53] However, the *David* court allowed discovery of sworn

---

[51] *See, e.g., DiMare Ruskin*, 2012 WL 12067868, at *5; *Widjaja v. Kang Yue USA Corp.*, No. 09 CV 2089, 2010 WL 2132068, at *1 (E.D.N.Y. May 20, 2010); *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 267 F.R.D. 257, 276-77 (D. Minn. 2007); *Avila-Blum*, 236 F.R.D. at 192; *E.E.O.C. v. Bice of Chi.*, 229 F.R.D. 581, 583 (N.D. Ill. 2005) (rejecting "Defendants' argu[ment] that the charging parties' credibility is directly relevant and therefore, they should be able to inquire about falsification of identity and immigration status"); *Galaviz-Zamora v. Brady Farms, Inc.*, 230 F.R.D. 499, 502 (W.D. Mich. 2005).

[52] *David v. Signal Int'l, LLC*, 735 F. Supp. 2d 440, 444 (E.D. La. 2010).

[53] *Id.* at 444, 447 (E.D. La. 2010) (internal quotation marks omitted) (discussing and reaffirming *David v. Signal Int'l, LLC*, 257 F.R.D. 114, 124 (E.D. La. 2009), objections overruled, No. CIV.A. 08-1220, 2009 WL 2030382 (E.D. La. June 2, 2009)); *see also id.* at 444 ("Signal argues that bias and prejudice taint the [visa] applications in that plaintiffs will exaggerate their claims to allow their wives and children to remain in the country.").

No. 15-60562

statements attached to the applications, as such discovery would not reveal plaintiffs' immigration status.[54]

In a few other such cases, however, district courts have permitted discovery of sensitive immigration-related information. For example, in a labor case involving allegations of numerous torts and federal and state labor law violations, the District of Colorado allowed discovery of T and U visa materials because they were relevant to many of plaintiffs' diverse claims and to "the issue of motivation and fabrication of each of the Plaintiffs' testimony."[55]

---

[54] *Id.* at 448. *See also E.E.O.C. v. First Wireless Grp., Inc.*, 225 F.R.D. 404, 406-07 (E.D.N.Y. 2004) (barring disclosure of plaintiffs' immigration status without rebutting defendants' claim that their status was relevant to the issue of damages); *Flores v. Albertsons, Inc.*, No. CV0100515AHM(SHX), 2002 WL 1163623, at *5-6 (C.D. Cal. Apr. 9, 2002) ("even assuming" immigration documents' relevance to the issue of damages, barring discovery in light of the *in terrorem* effect of production).

[55] *Camayo v. John Peroulis & Sons Sheep, Inc.*, No. 10-CV-00772-MSK-MJW, 2012 WL 5931716, at *1-2 (D. Colo. Nov. 27, 2012). The court further concluded, without analysis, that "any *in terrorem* effect is outweighed by the . . . Defendants' compelling need to obtain this relevant information." *Id.* at *2; *see also Fragoso v. Builders FirstSource Se. Grp. LLC*, No. 4:10-503-TLW-SVH, 2011 WL 767442, at *2 (D.S.C. Feb. 25, 2011) (allowing discovery of personal injury plaintiff's immigration status because, among other things, plaintiff's claim for past and future wage loss damages would be undermined if he were not "lawfully eligible for past and future work in the United States," and rejecting without analysis plaintiff's arguments based on "privacy concerns and . . . harassment"). In another Title VII case Koch cites, the Eastern District of Washington allowed discovery of T visa applications, finding relevance for reasons similar to those offered in *Camayo*. *E.E.O.C. v. Glob. Horizons, Inc.*, No. CV-11-3045-EFS, 2013 WL 3940674, at *5-6 (E.D. Wash. July 31, 2013). That case is distinguishable, however, because the potential *in terrorem* effect from discovery was limited: every claimant's immigration status was known and undisputed when discovery was sought, unlike in this case. *Id.* at *6; *see also Catalan v. Vermillion Ranch Ltd. P'ship*, No. CIV.A. 06-CV-01043WY, 2007 WL 951781, at *1 (D. Colo. Mar. 28, 2007) (allowing discovery of plaintiff guest workers' immigration history because that history was "material" to several claims and defenses in dispute, and because defendant employer had already been obligated to report them to immigration authorities on account of their absconding from the workplace).

A compromise approach is illustrated in *Perez v. Seafood Peddler of San Rafael Inc.*, No. 12-cv-00116 WHO (NC), 2013 U.S. Dist. LEXIS 190839, at *15 (N.D. Cal. Sept. 10, 2013) ("[D]efendants may not ask questions of witnesses regarding U Visas unless (1) there is a factual basis showing that plaintiff [the Department of Labor] offered, provided, or was requested to provide, U Visa certification to any Seafood Peddler employee in connection with the investigation or prosecution of this case; (2) that employee's testimony will be relied upon by plaintiff in this case; and (3) the employee is not a U Visa beneficiary within the meaning of § 1367(a)(2).").

No. 15-60562

In sum, the case law on this issue is nonbinding, mostly distinguishable, and equivocal even where relevant. Although existing authorities may inform our Rule 26 inquiry, the district court correctly recognized that none provide definitive guidance.

## 2. *The probative value of U visa discovery*

Finding nothing binding in the case law, the district court set out on its own Rule 26(c) balancing analysis. It first found that Koch had an appreciable interest in obtaining the discovery, since the claimants' "motive [was] relevant." The court explained that the number of claimants against Koch appeared to have "spike[d]" once the EEOC became involved, and because the EEOC has the authority to issue U visas, this was at least some evidence that the claimants may have lied in hopes of obtaining them.

We discern no fundamental error in the district court's analysis, nor in its conclusion that the discovery sought might well have significant probative value. To be sure, the court's "spike in claims" datum, on its own, is not particularly suggestive of mass fraud.[56] The EEOC's involvement could have caused the case's ranks to swell for any number of legitimate reasons; most obviously, the EEOC may have discovered additional harassment claimants during the pre-suit conciliation and investigation processes. Moreover, although Koch marshals what it characterizes as unequivocal evidence of claimants' duplicity, on the whole, the parties' briefing indicates genuine ambiguities in the still-developing factual record. We further note that the U visa process contains numerous protections against fraud,[57] which should deter

---

[56] Plaintiffs claim that the district court's "spike in claims" observation was factually erroneous. But as the court correctly explained, this action began with a suit by eight individual claimants; the EEOC's separate suit eventually brought in over a hundred others.

[57] Specifically, although the EEOC can certify U visa applications for further consideration, it is USCIS that has the power to grant each application, and it does so only

No. 15-60562

claimants from lying in their U visa applications and the EEOC from abetting applications that it knows or suspects to be fraudulent.[58] Finally, we reject Koch's repeated suggestions that plaintiffs' claims are so outlandish as to be unbelievable. In fact, substantial evidence suggests that serious abuse is all too common in many industries reliant on immigrant workers, including the modern-day poultry industry.[59]

---

after a de novo review of all relevant evidence. Moreover, USCIS can revoke U visas and initiate deportation proceedings if application fraud is uncovered. *See* 8 U.S.C. § 1101(a)(15)(U)(i); 8 C.F.R. §§ 214.14(c)(1), (c)(4), (h)(2), (i).

[58] If the EEOC solicited and certified applications that USCIS then found to be questionable or fraudulent, the claimants would be denied visas and possibly deported, despite having cooperated with the agency and revealed significant personal information. Such a result would hardly encourage future claimants to do the same, even if their claims were valid. Perhaps more importantly, the EEOC's own credibility with USCIS would suffer, making approval of future EEOC-certified U visa applicants less likely and further eroding the agency's ability to take advantage of the program. And the EEOC's credibility and reputation might also suffer in other contexts, harming the agency and its mission more broadly.

[59] *See, e.g.*, *No Relief: Denial of Bathroom Breaks in the Poultry Industry*, OXFAM AMERICA (2016), https://www.oxfamamerica.org/static/media/files/No_Relief_Embargo.pdf; *Lives on the Line: The Human Cost of Cheap Chicken*, OXFAM AMERICA (2015), https://www.oxfamamerica.org/static/media/files/Lives_on_the_Line_Full_Report_Final.pdf; Tom Fritzsche et al., *Unsafe at These Speeds: Alabama's Poultry Industry and its Disposable Workers*, SOUTHERN POVERTY LAW CTR. (2013), https://www.splcenter.org /sites/default/files/d6_legacy_files/downloads/publication/Unsafe_at_These_Speeds_web.pdf; Mary Bauer et al., *Injustice On Our Plates: Immigrant Women in the U.S. Food Industry*, SOUTHERN POVERTY LAW CTR. (2010), https://www.splcenter.org/sites/default/files /d6_legacy_files/downloads/publication/Injustice_on_Our_Plates.pdf; Lance Compa et al., *Blood, Sweat, and Fear: Workers' Rights in U.S. Meat and Poultry Plants*, HUMAN RIGHTS WATCH (2004), https://www.hrw.org/sites/default/files/reports/usa0105.pdf. *See generally* Charlotte S. Alexander & Arthi Prasad, *Bottom-Up Workplace Law Enforcement: An Empirical Analysis*, 89 IND. L.J. 1069, 1085-89, 1125 (2014) (immigrant workers in urban environments); Bernice Yeung & Grace Rubenstein, *Rape in the Fields: Female Workers Face Rape, Harassment In U.S. Agriculture Industry*, PBS: FRONTLINE (June 25, 2013, 2:39 AM), http://www.pbs.org/wgbh/pages/frontline/social-issues/rape-in-the-fields/female-workers-face-rape-harassment-in-u-s-agriculture-industry (immigrant fieldworkers); Grace Meng et al., *Cultivating Fear: The Vulnerability of Immigrant Farmworkers in the US to Sexual Violence and Sexual Harassment*, HUMAN RIGHTS WATCH (May 2012), https://www.hrw.org/sites/default/files/reports/us0512ForUpload_1.pdf (immigrant fieldworkers).

No. 15-60562

But although plaintiffs' claims are facially credible, and although the possibility that immigration benefits may have induced some claimants to step forward does not necessarily suggest that their claims are false, we find it plausible that some undocumented immigrants might be tempted to stretch the truth in order to obtain lawful status – and perhaps even lawful *permanent* status – for themselves and their families.[60] U visa applicants are analogous to testifying informants in criminal trials, and in that context, as one court has pithily observed, "[a]ny competent lawyer would . . . know[] that . . . special immigration treatment by [law enforcement agencies] [is] highly relevant impeachment material."[61] Given this, and given the considerable deference we owe the district court in its discovery rulings,[62] we cannot conclude that the district court abused its discretion in finding U visa discovery relevant and potentially probative of fraud.

## 3. *Plaintiffs' and the public's interest in preventing U visa discovery*

After finding U visa discovery relevant, the court turned to the other side of the ledger, analyzing whether the discovery would create an undue burden. It reasoned that the claimants did not need to fear being fired once Koch discovered that they sought U visas, since most of them no longer worked for the company and others "may have other protection" or could be sheltered by a protective order. Moreover, the claimants did not need to fear that Koch would report them to criminal or immigration authorities, because a protective

---

[60] *See supra* notes 5-6 and accompanying text. Indeed, it appears that U visa fraud is not unheard of, although there is little to suggest it is common. *See, e.g.*, Mark Becker, *9 Investigates: Illegal Immigrants Faking Crimes to Stay in Charlotte*, WSOC-TV (Nov. 11, 2014, 10:44 AM), http://www.wsoctv.com/news/special-reports/9-investigates-illegal-immigrants-faking-crimes-st/113455640.

[61] *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004).

[62] *See, e.g.*, *Sanders v. Shell Oil Co.*, 678 F.2d 614, 618 (5th Cir. 1982) ("A trial court enjoys wide discretion in determining the scope and effect of discovery. It is, in fact, unusual to find an abuse of discretion in discovery matters." (citations omitted)).

No. 15-60562

order could bar Koch from doing so and because any claimants who had sought U visas would already have revealed their undocumented status to federal officials. And the court stressed that it was not allowing a "fishing expedition," but only limited discovery of information related to U visas only. For these reasons, the court concluded, the relevance of the discovery sought outweighed any burden it might impose.[63] Below, we address the district court's stated reasons, then discuss factors it did not consider.

### a. Claimants' fears of being fired

Plaintiffs don't dispute that few of the claimants still work for Koch. However, they emphasize that some still do, and that Koch said earlier in the litigation that it will fire them if it turns out they are undocumented. Koch's statement is unsurprising: it is illegal to knowingly employ an undocumented worker, and U visa discovery would necessarily show Koch which of its employees are undocumented.[64] The district court apparently believed that a protective order could protect the employees from being fired. But it is unclear whether the protective order ultimately entered in this case does so, because it allows use of U visa discovery for purposes unrelated to this litigation if "required by relevant law." It is uncertain whether a protective order *could* protect the employees in the way the district court envisioned: doing so might force Koch to violate the law.[65]

Koch responds, correctly, that any workers with U visas *are* authorized to work in the United States, and that even workers with pending U visas may

---

[63] The court also noted claimants' fear that U visa discovery might reveal their criminal histories, and responded by barring discovery of "prior crimes that may be reflected in their applications."

[64] *See* 8 U.S.C. § 1324a(a)(2).

[65] This assumes that the knowledge of Koch employees privy to the U visa discovery would necessarily be imputed to the company for purposes of the Immigration and Naturalization Act, an issue we do not address here.

No. 15-60562

receive work authorization.[66] That should indeed reduce claimants' fear of being fired. But assuming that some claimants did apply for U visas, their applications may still be pending or may have been rejected, so they may not be authorized to work.[67] In turn, despite the protective order and the protections of the U visa program itself, there remains a risk that U visa discovery will cause some claimants or family members to lose their jobs.

This is a serious risk, but also a highly speculative one. It is unclear how many claimants remain employed by Koch, and how many will still be working for the company by the time U visa discovery takes place.[68] Moreover, it is uncertain how many in that group may have applied for or received U visas; put differently, because the U visa applications in this case are entirely hypothetical, the *in terrorem* effect of discovering them is hypothetical as well.

---

[66] S*ee* 8 U.S.C. § 1184(p)(6).

[67] It seems less likely that U visa applicants in this case (if any) would have been rejected outright, both because of the program's relatively high acceptance rate and because there is currently a years-long backlog of U visa applicants. *Number of I-918 Petitions for U Nonimmigrant Status (Victims of Certain Criminal Activities and Family Members) by Fiscal Year, Quarter, and Case Status 2009-2016*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Dec. 2015), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Victims/I918u_visastatistics_fy2016_qtr1.pdf (at the end of fiscal year 2015, 10,026 applications were approved, 2,715 were denied, and 63,762 were pending (all excluding derivative applications)). As for applicants whose applications remain pending – probably most of them, given the backlog – the U visa statute says that they "may" receive work authorization, but the record and briefs do not indicate how many pending applicants are in fact authorized. *See* 8 U.S.C. § 1184(p)(6); *see also* Krisztina E. Sabo et al., *Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants*, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJ. at 7 (Feb. 12, 2014), http://niwap.org/reports/Early-Access-to-Work-Authorization.pdf (asserting that "[w]hile express statutory authority to grant work authorization to U visa applicants who have met bona fide determination exists, this has not been implemented for all U visa applicants" (emphasis omitted)).

[68] In early 2014, plaintiffs asserted that "30 of the Aggrieved Individuals in this action, as well as dozens of their family members, are still employed by Defendant Koch Foods." However, employee turnover rates are high in the poultry processing industry. *See* Compa et al., *supra* note 59, at 108.

No. 15-60562

Nonetheless, if claimants have applied for U visas, their jobs may still be on the line, contrary to the district court's apparent belief.

### b. Claimants' fears of being reported

Although few claimants need to fear termination, all could fear that Koch will report them and their families to immigration authorities if it learns of their U visa applications. Of course, the protective order in place does not allow this: although Koch cannot knowingly *employ* undocumented workers, nothing suggests that it would legally have to *report* current or former employees upon learning that they are undocumented. Nevertheless, the claimants might fear that Koch will violate the order and turn them in anyway. And employers commonly and unlawfully retaliate against irksome workers by reporting or threatening to report them to immigration authorities.[69] A protective order would not necessarily quell claimants' fear of suffering the same fate, regardless of Koch's intent to comply with the order.[70]

In downplaying claimants' asserted fears of being reported, the district court stressed that any claimants who submitted U visa applications have already revealed their undocumented status to the EEOC and possibly USCIS.

---

[69] *See, e.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 886-87 (1984); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1064-65 (9th Cir. 2004) (collecting cases); Stephen Lee, *Private Immigration Screening in the Workplace*, 61 STAN. L. REV. 1103, 1122-23 (2009) (discussing empirical studies indicating a link between employers' anti-union animus and their use of immigration-related intimidation); Fritzsche et al., *supra* note 59, at 4-5; Meng et al., *supra* note 59, at 7, 48, 81; Annette Bernhardt et al., *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities*, NATL. EMPLOYMENT LAW PROJ. 24-25 (2009), http://nelp.3cdn.net/ e470538bfa5a7e7a46_2um6br7o3.pdf.

[70] *See, e.g.*, *David v. Signal Int'l, LLC*, 257 F.R.D. 114, 126 (E.D. La. 2009) ("Even under the umbrella of a protective order, the danger of intimidation would inhibit plaintiffs in pursuing their rights in this case."). *Cf. Rivera*, 364 F.3d at 1065 n.5 ("The fact that NIBCO has pledged not to use the plaintiffs' immigration status to retaliate against them does not eliminate the substantial risk of chilling the rights of these and future plaintiffs. . . . [T]he existence of post hoc legal remedies for retaliation do[es] not necessarily provide adequate protection when plaintiffs anticipate retaliation that would result in extraordinarily burdensome consequences.").

No. 15-60562

But as Plaintiffs note, claimants might not have feared revealing their status only to federal officials who process U visa applications, since those officials apparently are not involved in immigration enforcement. An abuse victim might well be willing to disclose sensitive information to a few sympathetic officials, yet nonetheless fear that his or her abuser might obtain that information and spread it far and wide.[71] In other words, the claimants reasonably might fear disclosure of their status to certain authorities, but not others, so their having submitted U visa applications does not rule out an *in terrorem* effect from further disclosure, as the district court apparently believed.[72]

### c. *The extent of additional discovery*

In allowing U visa discovery, the district court acknowledged that besides potentially revealing sensitive information, U visa discovery "at this late date will delay[] the resolution of this matter and creat[e] an enormous, costly hardship on Plaintiffs." On appeal, plaintiffs claim that this delay and hardship are undue regardless of the sensitivity of the information at issue. Their arguments have force, but do not suggest an abuse of discretion.

Plaintiffs' main argument is that Koch does not need U visa discovery because the company has other material with which to undermine the claimants' allegations. That may be true, but U visa applications would be

---

[71] Undocumented immigrants can and do distinguish between revealing their status to U visa authorities and other officials: tens of thousands apply for U visas each year. *See Number of I-918 Petitions*, *supra* note 67.

[72] Plaintiffs also point out that an immigrant need not be undocumented to fear U visa discovery. *See Rivera*, 364 F.3d at 1065 ("Even documented workers may be chilled by the type of discovery at issue here. Documented workers may fear that their immigration status would be changed, or that their status would reveal the immigration problems of their family or friends; similarly, new legal residents or citizens may feel intimidated by the prospect of having their immigration history examined in a public proceeding. Any of these individuals, failing to understand the relationship between their litigation and immigration status, might choose to forego civil rights litigation.").

No. 15-60562

novel and significant impeachment evidence, as we noted.[73] Assuming that that discovery is permissible, it should not be barred simply because other impeachment evidence exists.

Plaintiffs further argue that the district court has in principle authorized dozens more depositions and subpoenas; that this new discovery will follow an already lengthy and intensive initial round; and that they lack resources to engage in such arduous additional discovery, unlike Koch. Their arguments have weight, especially since the limited written discovery explicitly approved by the district court would presumably give Koch the basic information it needs to argue its U visa fraud theory. Nevertheless, plaintiffs' arguments implicate the *quantity* of additional discovery, rather than the *substantive scope* of additional discovery. And the quantity of additional discovery remains within the district court's discretion to control. Although that court stated that U visa discovery was not necessarily limited to the written discovery it specifically discussed, it also emphasized that it was not allowing a "fishing expedition" and appeared sympathetic to plaintiffs' concerns about time, expense, and logistical complication. Plaintiffs can seek from the district court relief from any unduly burdensome demands.

### d. *The burden on non-claimants*

The district court's analysis of the harm that U visa discovery might cause the claimants was imperfect, but not critically so. More pressing is that the district court did not address how U visa litigation might intimidate individuals outside this litigation, compromising the U visa program and law enforcement efforts more broadly.

---

[73] *See supra* notes 60-61 and accompanying text.

No. 15-60562

These dynamics jeopardize the EEOC's interests and those of the broader public. The district court could and should have weighed them in its Rule 26 analysis. But its analysis considered only the immediate chilling effect of U visa discovery *on the individual claimants in this case*. Those individuals are not the only ones who might be affected by the disclosure of the claimants' U visa information. Thousands apply for U visas each year, and they do so with the assurance that federal authorities will keep their applications confidential.[74] Allowing U visa discovery from the claimants themselves in this high-profile case will undermine the spirit, if not the letter, of those Congressionally sanctioned assurances and may sow confusion over when and how U visa information may be disclosed, deterring immigrant victims of abuse – many of whom already mistrust the government[75] – from stepping forward and thereby frustrating Congress's intent in enacting the U visa program.

This is a serious concern for plaintiff EEOC, *amicus* NLRB, and the federal and state departments of labor, all of which certify U visa applications.[76]   Considerable evidence suggests that immigrants are

---

[74] *See, e.g.*, *Immigration Options for Victims of Crimes: Information for Law Enforcement, Healthcare Providers, and Others*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Feb. 2010), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Battered%20Spouse,%20Children%20%26%20Parents/Immigration%20Options%20for%20Victims%20of%20Crimes.pdf (brochure stating that "all agencies within the Department of Homeland Security (DHS), including USCIS, are legally prohibited from disclosing that a victim has applied for VAWA, T, or U immigration benefits"); U.S. Citizenship & Immigration Servs., Privacy Waiver Authorizing Disclosure to a Third Party, ICE Form 60-001 (Feb. 2011), at 1-2, https://www.ice.gov/doclib/news/library/forms/pdf/60-001.pdf ("[Y]ou are under no obligation to consent to the release of your information to any third party. . . . If you have applied for or received [a U visa], you are legally entitled to confidentiality.").

[75] *See, e.g.*, Alexander & Prasad, *supra* note 59, at 1101 & n.10; Stephen Lee, *Monitoring Immigration Enforcement*, 53 ARIZ. L. REV. 1089, 1100-03 (2011); Meng et al., *supra* note 59, at 72-76.

[76] *See* 8 C.F.R. § 214.14(a)(2); *The U Visa: A Potential Immigration Remedy for Immigrant Workers Facing Labor Abuse*, NAT'L EMPLOYMENT LAW PROJ. at 3-4 (Mar. 2014), http://www.nelp.org/content/uploads/2015/03/UVisa.pdf.

No. 15-60562

disproportionately vulnerable to workplace abuse and, not coincidentally, highly reluctant to report it for fear of discovery and retaliation.[77] And threats of deportation are among the most familiar and dreaded means by which unscrupulous employers retaliate against immigrant employees.[78] Thus, if the agencies cannot credibly assure potential U visa seekers that their sensitive information will be kept private, they may become much less able to use the program to solicit cooperation from those most in need of their help. Protective orders will not necessarily reassure potential claimants.[79] Nor can the agencies easily reassure potential claimants that although U visa discovery was allowed in *this* case, it will not be allowed in *their* cases. Most of Koch's and the district

---

[77] *See, e.g.*, sources cited *supra* note 59 and 69; Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667, 676-79 (2003) (collecting evidence that undocumented workers underreport labor violations); Kati L. Griffith, *Undocumented Workers: Crossing the Borders of Immigration and Workplace Law*, 21 CORNELL J.L. & PUB. POL'Y 611, 616-17 (2012) (a 2008 survey of 4,387 low-wage immigrant workers in three cities suggested that immigrants are disproportionately likely to experience wage and hour violations); Chirag Mehta et al., *Chicago's Undocumented Immigrants: An Analysis of Wages, Working Conditions, and Economic Contributions*, UNIV. OF ILLINOIS AT CHICAGO CTR. FOR URBAN ECONOMIC DEVELOPMENT at 27-29 (Feb. 2002), https://cued.uic.edu/wp-content/uploads /undoc_wages_working_64.pdf (in an analysis of 1,186 Chicago immigrant workers, finding that "undocumented workers more often experience unsafe working conditions than do immigrants with legal status," that they file claims less frequently than would be expected given their rates of reported serious injury and unsafe working conditions, and that there is a strong and statistically significant correlation between undocumented status and wage and hour complaints). *But see* Alexander & Prasad, *supra* note 59, at 1087, 1090, 1092, 1127-29 (in an analysis of 2008 survey conducted by Griffith, failing to find statistically significant correlations between immigration status and reports of workplace problems, likelihood to make a complaint related to a workplace problem, and employer retaliation for such complaints).

[78] On employers' use of threats of deportation and similar immigration consequences, *see supra* note 69; *see generally* 151 CONG. REC. E2605-04 (Dec. 17, 2005) (statement of Rep. Conyers), 2005 WL 3453763 (in discussing amendments to 8 U.S.C. § 1367, noting that "[t]hreats of deportation are the most potent tool abusers of immigrant victims use to maintain control over and silence their victims and to avoid criminal prosecution"). On employees' fear of such consequences, *see* Compa et al., *supra* note 59, at 103-04, *Lives on the Line*, *supra* note 59, at 28; Fritzsche et al., *supra* note 59, at 38; Bauer et al., *supra* note 59, at 23, 42, 49-51; *supra* note 59; Meng et al., *supra* note 59, at 19, 49; Mehta et al., *supra* note 77, at 28-29.

[79] *See supra* notes 69-70 and accompanying text.

No. 15-60562

court's reasons for allowing U visa discovery here – e.g., that U visas provide a motive to fabricate abuse, that a protective order could be entered, that U visa applicants already would have revealed their status to federal authorities, and that the evidence of abuse is debatable – are likely present in virtually every immigrant-abuse case in which the EEOC or a similar agency is involved.

In sum, allowing discovery of U visa information may have a chilling effect extending well beyond this case, imperiling important public purposes. The district court, while thoughtful, confined its focus to the interests of the individuals before it. We agree with most of the district court's careful consideration of the sensitive issues presented. But having weighed *all* of the problems U visa discovery may cause against Koch's admittedly significant interest in obtaining the discovery, we are compelled to conclude that the discovery the district court approved would impose an undue burden and must be redefined.

VII

Rather than impose an order of our own, we remand to the district court to devise an approach to U visa discovery that adequately protects the diverse and competing interests at stake. Our discussion indicates the basics of that approach. Because claimants' U visa applications would be novel and significant impeachment evidence, we do not forbid U visa discovery outright. At a minimum, however, any U visa discovery must not reveal to Koch the identities of any visa applicants and their families, at least in the liability phase. In the liability phase, the probative value of the U visa evidence is maintained even though it is anonymized because the trier of fact is charged with determining liability to the complainants as a whole, and therefore the proportion of complainants who have applied for U visas in connection with this matter is informative regardless of the identity of specific applicants. However, if the trier of fact determines that Koch is liable to the complainants,

No. 15-60562

then it will likely be necessary to de-anonymize the U visa application discovery for the purpose of proceeding with individual damages determinations, as proof in that regard necessarily must be individualized.

Beyond these broad contours, we leave the management of U visa discovery to the district court. Rule 26(d) gives that court wide discretion to craft flexible and nuanced terms of discovery.[80]

In light of the above, we VACATE the district court's certified discovery orders and REMAND for further proceedings not inconsistent with this opinion.

---

[80] *See generally* FED. R. CIV. P. 26(c)(1)(A)-(H); *Granger v. Slade*, 90 F. App'x 741, 742 (5th Cir. 2004) (unpublished) (Rule 26 protective orders are "designed to shape the changing needs of the litigation and subject to continued modification by the district court").